UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
(Asheville Division)

---------------------------x
UNITED STATES OF AMERICA, :
Plaintiff :
:
:
vs :Criminal Action:1:12-CR-20
:
AVERY TED CASHION, III, :
RAYMOND M. CHAPMAN, and :
THOMAS E. DURHAM, Jr.,
Defendants. :
---------------------------x

Thursday, April 23, 2015
Asheville, North Carolina

The above-entitled action came on for a Sentencing Hearing Proceeding before the HONORABLE MARTIN K. REIDINGER, United States District Judge, in Courtroom 1 commencing at 9:00 a.m.

**APPEARANCES**:
On behalf of the Government:
DON GAST, Esquire
Office of the United States Attorney
100 Otis Street
Asheville, North Carolina 28801

MICHAEL E. SAVAGE, Esquire
U.S. Attorney's Office
227 W. Trade Street
1700 Carillon
Charlotte, North Carolina 28202

On behalf of the Defendant Cashion:
SEAN P. DEVEREUX, Esquire
The Jackson Building
22 South Pack Square, Suite 1100
Asheville, North Carolina 28801

Tracy Rae Dunlap, RMR, CRR 828.771.7217
Official Court Reporter

# I N D E X

**APPEARANCES CONT'D:**

On behalf of the Defendant Chapman:
ANTHONY G. SCHEER, Esquire
Rawls, Scheer, Foster, Mingo & Culp, PLLC
1011 East Morehead Street, Suite 300
Charlotte, North Carolina 28204

On behalf of the Defendant Durham:
CHRISTOPHER C. FIALKO, Esquire
Rudolf, Widenhouse and Fialko
225 East Worthington Avenue, Suite 200
Charlotte, North Carolina 28203

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| David Ruffin | 9 | 33 | 90 | 93 |

**EXHIBITS**

| | Page |
|---|---|
| Government's Exhibit No. 1 | 96 |
| Government's Exhibit No. 2 | 96 |
| Government's Exhibit No. 3 | 96 |
| Government's Exhibit No. 4 | 96 |
| Government's Exhibit No. 5 | 96 |
| Government's Exhibit No. 6 | 96 |
| Defendant's Exhibit No. 1 | 96 |
| Defendant's Exhibit No. 2 | 96 |

| | Page |
|---|---|
| Reporter's Certificate | 105 |

**P R O C E E D I N G S**

THE COURT: Good morning, everyone. This morning we have on the calendar an evidentiary hearing, actually, for three different cases -- actually three different defendants who, I believe, were in the same indictment and there was to be an evidentiary hearing regarding the objections to the presentence reports with regard to United States versus Thomas E. "Ted" Durham, Avery Ted "Buck" Cashion, and Raymond M. "Ray" Chapman but, if I understand correctly, all of the objections to the portions of the presentence reports to which this evidence was to pertain have been withdrawn. So I'm somewhat unclear as to what we are here to accomplish.

MR. FIALKO: Your Honor?

THE COURT: Mr. Fialko.

MR. FIALKO: Yes. Chris Fialko for Ted Durham. Would you like our clients to come up, or can they just stay seated right here?

THE COURT: I will leave that to your discretion as to where you want your clients to sit.

MR. FIALKO: I'd like it if he could sit behind me. Would that be okay, Your Honor?

Your Honor, to address your question about what are we doing here. I feel like -- kind of like the sideshow that's become the main event today. So let me

try to explain. For Ted Durham, it was never my intention to present evidence when we scheduled this two months ago -- I think it was two months ago -- for the presentence report objections. What I understood at the time was that the co-defendants had wanted to present evidence to the objections, and then I had -- including calling Mr. David Ruffin as a witness -- an expert witness. And I had questions, then, I was going to ask Mr. Ruffin concerning strictly 3553(a) factors of mitigation of Mr. Durham's sentence. Essentially -- and that's what I want to do this morning.

Now I communicated once -- I guess it was a few weeks ago that Mr. Scheer had withdrawn his objections -- to your office that what I was trying to do, and then we withdrew our objections just so there wouldn't be any confusion about any evidence I was going to be putting up. So what I want to do today is to put Mr. Ruffin up to talk about 3553(a) factors.

I communicated with the government as well, and we talked about perhaps we should do that just at the sentencing. I communicated that to your chambers, and I think your chambers said let's go forward today and do what we can today. So I don't know if that answers your question about what we're doing here. But I have one witness, Mr. David Ruffin, that I think from my portion

will take between 30 to 60 minutes.

THE COURT: Okay. Is there anything else that any of the parties are planning to present today, other than the testimony of Mr. Ruffin? Mr. Savage.

MR. SAVAGE: Your Honor, depending on what Mr. Ruffin says, we have present in the courtroom and would call to testify on behalf of the government the Examiner-in-Charge, Jeffrey Burgess, who I think the Court may recall from the trial, and Mr. Ryan Senegal who is a supervisory examining agent, depending on the scope of Mr. Ruffin's testimony. So that's all we have.

THE COURT: Okay. Anything else for any of the other defendants?

MR. SCHEER: No, Your Honor, not beyond what may be some additional questions for Mr. Ruffin, Your Honor.

MR. DEVEREUX: No, Your Honor.

THE COURT: While we're talking about matters of organization and housekeeping. I don't know whether my Courtroom Deputy has been in contact with you about scheduling, but what I am hoping to do is to schedule all of the sentencings regarding the remaining defendants in this indictment -- I think there are six of them -- and I would like to schedule them for June 2nd. Is that going to be possible?

MR. GAST: Your Honor, good morning. I answered

the e-mail and I just indicated that we -- it's hard to forecast now because it's still early. But because June 2nd is a grand jury day and we're also going to be down -- one of our AUSAs is going to be off for training. So I or other AUSAs will have to be covering that. It's always difficult to schedule on a grand jury day -- it becomes risky and we can't tell how heavy or light a docket it is right now. So if there's another day we would prefer that, but we, of course, will make it work if that's the only day.

THE COURT: And one reason I was hoping to do all of those on the 2nd -- I was doing it cognizant of the fact that it's an Asheville grand jury day but hopeful that at least Mr. Savage would be available on that day, since he would be coming from Charlotte. Not to imply that I'm calculating to cut Mr. Gast out of the process, but we are very limited on the number of days that we can have sentencings here.

I think everybody is aware of that now because of the limitation of resources regarding the security in the building, particularly with the Marshals Service, and that's why days like today tend to be very problematic for the Court because this morning, which would have been five or six slots for sentencings, we are now going to use up for apparently one and maybe three witnesses and

not end up sentencing anybody. So I need to fill in all the slots that I can.

I recognize that grand jury is an inconvenience for the government but it is -- it was my hope that because of who the lawyers are who are involved in this case that we could at least schedule these cases since none of the s with the exception of Mr. Vinson if his case is ready none of the defendants are in custody. We have substantially lesser security issues, et cetera. Mr. Savage.

MR. SAVAGE: Your Honor, I don't pretend to be able to fill Mr. Gast's shoes but I'm available on the 2nd and can come up and do it. I'm happy to be here on that day. I would inquire, does the Court intend to sentence Mr. Vinson? The only thing I'm thinking is if we did five or six defendants, including -- because there would be Messrs. Cashion, Chapman, Gabler, Ollis, Durham. And those, I think we could -- would be a day. I don't know about Mr. Vinson, who has numerous objections, obviously, and I don't know if that would all fit in. That would be my only concern.

THE COURT: Well and I have the same concern. And my objective at that point is if we can't fit it all into one day, the one that would get bumped to later would be Mr. Vinson. I think his needs to be last anyway, just

as a matter of organization. I've learned a long time ago that just because there are a lot of objections at this stage doesn't mean that there will necessarily be a lot of objections by the time we get to sentencing.

MR. SAVAGE: Yes, Your Honor.

MR. FIALKO: Yes, Your Honor.

THE COURT: Mr. Fialko.

MR. FIALKO: Your office did communicate with me and gave two dates in May and two in June. June 2nd is a very good day for me.

THE COURT: Okay. Mr. Scheer.

MR. SCHEER: Yes, Your Honor. June 2nd will work for me as well.

MR. DEVEREUX: For us, also, Your Honor.

THE COURT: Okay. We'll do it. Please put that on your calendars then and we will -- we'll get that done. It may or may not include Mr. Vinson. In fact, I think it may be overly ambitious to think that we can fit all of these in, including Mr. Vinson, but it would be my hope that we get all the other five completed on that day.

Anything else that we can address or that we need to address that will save us some time before we move on to the testimony of Mr. Ruffin? Seeing that there are none, we will move on.

Mr. Fialko, call your witness.

MR. FIALKO: I call David Ruffin.

THE COURT: Please come forward to be sworn.

(Witness duly sworn at 9:10 a.m.)

THE COURT: You may proceed.

**DIRECT EXAMINATION**

BY MR. FIALKO:

Q. Good morning, Mr. Ruffin. Can you state your name for the record?

A. My name is David Ruffin.

Q. And how old are you?

A. I am 65 years old.

Q. What is your occupation, Mr. Ruffin?

A. I am a co-founder of a consultancy company based in Raleigh that works largely with community banks.

Q. I'm sorry. I missed that last part.

A. Its client base is largely community and smaller regional banks.

Q. What's the name of that company?

A. Credit Risk Management, LLC.

Q. And when did you form that?

A. 1989.

Q. Let me go back just to the beginning of your career. Where did you go to college?

A. The university of North Carolina at Chapel Hill.

Direct - Ruffin

Q. And when did you graduate and with what degree?
A. 1971. And I graduated with a degree in history.
Q. And what was your first job?
A. My first job was actually working for a United States congressman.
Q. When did you get into the banking business?
A. 1973. November of 1973.
Q. And where was that?
A. That was with Planter's National Bank in Roanoke Rapids, North Carolina.
Q. And what did you do at that bank?
A. Well I started out as collecting -- the term was "adjustor" at that time -- and had a number of lending position jobs, both consumer and commercial, and credit or credit risk jobs at Planter's, which I was there for 11 years and lived in various places in eastern North Carolina.
Q. And when you left Planter's, what was your position with --
A. I was a credit approver for a region of Planter's National Bank and then took a position with First Union.
Q. All right. How long were you at First Union?
A. Five years.
Q. And what was your job at First Union?

A. Originally, it was an area credit administrator, and then ultimately I became the Chief Credit Officer for the eastern half of North Carolina.

Q. And what was your role and duties and responsibilities in that job as the Chief Credit Officer for eastern North Carolina?

A. I had a loan authority of $5 million at the time and was largely approving credits, larger credits, that came to our risk -- credit risk function that was being generated by the lending staff.

Q. And when you say you were approving credits, are you talking about loans?

A. Yes.

Q. What kind of loans?

A. It would be both C&I, which is commercial and industrial loans, as well as commercial real estate loans.

Q. And you held that job or you were -- wait. You said that was for eastern North Carolina. Define that geographical region.

A. Basically, all of the First Union offices that were east of Burlington, North Carolina.

Q. How many were that?

A. I would estimate there were probably 35.

Q. Okay. And why did you decide to found Credit Risk

Management?

A. A very difficult decision because I was asked to -- by my boss, who was Mel Murray at the time, Chief Credit Officer for First Union to prepare to start moving around as First Union was acquiring and moving banks. And it was a quality of life issue for me. I grew up in eastern North Carolina and I did not want to live west of Raleigh, and I was stable in Raleigh. So we decided to -- a gentleman that worked for me decided to open this consultancy.

Q. And again, what year did you found Credit Risk Management?

A. 1989.

Q. And has it been in operation since then?

A. It has.

Q. How many employees do you have now?

A. Forty-eight, I believe.

Q. And what have been your roles at the company over the last 26 years?

A. Well for the first five years it was just the two of us using kind of an eclectic group of things, like writing loan policy, training officers, doing credit training, doing loan review work. And then, as we began about 1995 to get more and more work, we started building the company out in terms of hiring associates.

Q. All right. So what type of services does your company Credit Risk Management offer to community banks?

A. A variety of products and services along the credit management perspective. Loan review work. We do due diligence work. Due diligence being loan review that's associated with capital raise or acquisition of portfolios and the M&A, or mergers and acquisition, phase. We do -- we provide 120 banks with maintaining their policies and procedures. That's customized policies and procedures.

We have about 80 banks that have bought underwriting tools that we have developed and we maintain for them. We do credit training. We do compliance training, documentation training. And I do largely consulting work around loan process. Best practices around loan processing -- processes of how loans are approved, how -- the structure of the production and risk and so forth.

Q. What -- how often are you asking to and do you give speeches or lectures to bankers?

A. Quite often. I speak quite a bit to the trade association groups and as well as some of -- like, the North Carolina Commissioner of Banks has a annual directors' college that I'll be speaking to in July. But it's probably a couple times a month I'm speaking to

groups relative to credit risk and issues of the day relating to credit -- bank credit.

Q. Do you have an estimate of how many times you've been invited to give speeches or training in the last three years?

A. Probably 25, 30.

Q. Your Honor, may I present an exhibit at this point?

THE COURT: You may.

BY MR. FIALKO:

Q. Mr. Ruffin, I'm going to show you what I've marked as Defendant's Exhibit No. 1. Can you tell me what this is?

A. Yes. This is a list of forums by which I have spoken since 2013.

Q. And are the ones in the 2015 column the ones that you've either spoken or are scheduled to speak at?

A. That is correct.

Q. So you -- are all these places that you've been invited to speak?

A. Yes.

Q. Okay. So you have spoken at the bank directors' symposium, for example?

A. Yes.

Q. Have you been invited by the Banking Commission to

speak?

A. Yes.

Q. The North Carolina Banking Commission?

A. Yes. Just two day s ago, as a matter of fact. They actually went through a period of two years where that college or forum was not held because they had gone through the cycle of the directors, and the fact that there was so few de novo banks that there really were not many directors that had not already gone through that process. But they have re-established that for this year.

Q. Okay. Mr. Ruffin, how many times have you testified as an expert witness in a legal proceeding?

A. I would estimate six or seven times.

Q. All right. Who has hired you to do that?

A. Well it has been a variety of circumstances. I have been -- in one case, it was a creditor rights circumstance against a large bank. But most of the time it's about attorneys that reached out to me about giving perspective of the circumstance or of the industry at the time. But it's a variety of circumstances.

Q. Did you give some testimony in a deposition in a recent case in Wilmington?

A. I did.

Q. Just briefly, what was that case about and who --

how did you come to testify at it?
A. This was the Cooperative Bank in Wilmington that we had done loan review work for about four or five years prior to its being closed in a bank failure. And we were asked to come in -- I was subpoenaed by the defendants, which was the former CEO and directors that were being charged. And I was called for perspective on what we had seen relative to the run up of the failure of the bank.
Q. And when you say "charged." They were actually sued by the FDIC; right?
A. That's right.
Q. It wasn't a criminal case?
A. I believe that's correct. Yes.
Q. Mr. Ruffin, just a couple more questions about your background. Do you sometimes consult for the regulatory agencies themselves?
A. I have what I consider to be a rather symbiotic relationship with the regulatory agencies because I would say, from kind of a vin diagram perspective, a lot of what we do is really to support what the regulatory agencies are charged with enforcing. We have, you know, very, very good relations with them. In fact, we reach out to them when -- sometimes when we need clarification of what banks need to understand.
Q. Is your firm doing training for the Federal

Reserve in Atlanta?

A. Yes. Specifically to your question. Just last week we finished a global cash flow training for the Federal Reserve Bank of Atlanta for their examiners, yes. And they had reached out to us to ask us to give that training to their examiners, yes.

MR. FIALKO: Your Honor, I'm not sure if this is necessary, since we don't have a jury here and this is a sentencing issue, but I would tender, at this point, Mr. David Ruffin as an expert witness in Credit Risk Management and banking practices.

THE COURT: Any objection?

MR. SAVAGE: No objection, Your Honor.

THE COURT: You may proceed.

MR. FIALKO: Thank you.

BY MR. FIALKO:

Q. If I can ask the clerk. Madam, how do I turn this off? I'm sorry. That light.

Mr. Ruffin, when I first spoke with you, I think last month, about community banks, you immediately mentioned one particular statistic about how many banks had been chartered over the last, say, decade or more actually. Can you tell the Court about that?

A. Yes. I had spoken very recently to a conference, an M&A conference, in Phoenix a week or two after your

call -- before your call. And one of the presenters there had talked about there had been 1,042, I believe, de novo charters approved in the ten years prior to the financial crisis or thereabouts. And we had only -- and I think only four since the end of 2008. So that was -- it was presented, of course, because it was considered a very stark difference between large numbers of de novo charters for the financial crisis before the financial crisis and very few after.

Q. So let me make sure I'm getting this right. From 2000 to 2008 there had been 1,042 of these community bank charters you're talking about?

A. Yes.

Q. Approved in the United States, is that what you said?

A. Correct.

Q. And then since 20- -- I think you mentioned to me since December 2008 there were only four?

A. Yes. And that largely comes from -- we work with a group called S&L, which is a big data provider for public data that's out there with the banking industry. And after your question of me of how many has -- have been approved since that 1,042, I could glean only four that had actually --

Q. In the whole country?

A. In the whole country since 2008. Yes, since the end of 2008.

Q. Do you have an opinion as to why so few new community banks have been attempted?

A. Well it had lost its appeal. And, of course, many community banks were at the fulcrum of the regulatory concern because they had a two-to-one ratio of exposure to real estate, and real estate is at the heart of the financial crisis. And so the appeal of investors, as well as the scrutiny of the regulators to approve those charters, had become a night and day issue in terms of a de novo bank being seen as appealing or even a regulatorily desirable venture.

Q. What do you mean when you said that the community banks had a two-to-one exposure to real estate?

A. Well, if you -- and I've followed this number. And when I speak, I consistently show this pie chart that the FDIC provides every quarter. And it depicts on one hand the banks larger than a billion dollars in assets and those banks less than a billion dollars in assets. Almost consistently since 1997 there has been a roughly 62 to 67% of all community banks, which would be the smaller banks, have in some form or the other have their loan assets tied to real estate. That same equivalent for the larger banks is usually down into the 38 to 44%.

It's fluctuated a bit. But the point there is that the community bank, the network of smaller banks were highly dependent on real estate related loans. And therefore, it became an issue disproportionate to them because of that -- because of the real estate being at the source of the financial -- of much of the financial crisis.

Q. In other words, the real estate crash in '07-08 made it very hard for the community banks. Is that what you're saying?

A. Yes.

Q. So I want to turn to a little bit about what you do teach and what your company does about the best models for sound commercial and real property lending. What is the best model for community bank to produce and underwriter commercial and real property lending?

A. Well I have believed this fundamentally -- even well before the financial crisis -- and that is whatever process a bank uses, it has to have a distinct center of gravity between -- and distinct between loan production and risk management. So, however that is designed or who populates that within the bank, there needs to be a clear distinction between loan production and risk management or approving of those loans. It's a check and balance that needs to be in place.

Q. And so what are you speaking of when you're

Direct - Ruffin

talking about loan production itself?
A. Loan production is the lender that is the face of the bank to the customer, the borrowing customer. It's the person that is generating loan production and is looking for loan opportunities in the marketplace.
Q. So those are the people who are, for lack of a better term, selling the loans; right?
A. They are the salesmen of the bank in effect, yes.
Q. All right. And then what about the credit management side or the underwriting side?
A. The credit management piece is the check and balance. It is the devil's advocate, if you will, about where -- okay. This is an opportunity. Is it worth the risk? Is it worth what we're being paid for on this risk? And therefore, it needs to be approved independent of the sales incentive to book more loans.
Q. So what are the things that you worry about then when -- if there's not sufficient separation between the production and the credit risk?
A. Well the primary thing I worry about is that I -- in my long experience in banking I've never met anyone that can serve both masters. It's not possible.
Q. Why not?
A. You can't be both a sales advocate and a risk manager at the same time. It just -- they're just

inherently different roles, and I do not see them in any way being easily given to one person and being managed well.

Q. Why is that?

A. You're having to determine what master are you serving, and that's --

Q. Okay. So let's talk about the two different master s you're talking about. So what's the master of the production side?

A. The master of the production side is to get enough production in terms of loan growth to justify the existence of the bank and to return an investment on to the people that fund to the bank and almost surely cannot do that without loan growth.

Q. And what's the master of the underwriting or credit risk side?

A. Is to play the devil's advocacy and say okay, this is worth the risk. This is -- we're getting paid, we think, for the risk we're taking, and we'll agree that there's some element of this that could be lost but for the most part this is a risk worth taking.

Q. Pardon me. I'm sorry.

A. This is a risk worth taking but it's an independent judgment applied to that risk worth taking, separate and apart from the lender that is offering up

the opportunity.
Q. And why is it important for it to be an independent judgment?
A. In all due respect, probably for the same reason that the two -- there are two of you on two different sides of the courtroom.
Q. Which is?
A. You're advocating different points of view. That's the dynamic that should be in place -- always should be in place in bank lending always.
Q. And during the 2000s, during the banking boom in community banks what did you see? Was that dynamic in place in community banks?
A. I did not. One of the problems that arose, perhaps unwittingly, but it did happen, was that you had a plethora of community banks that were formed that came out of bankers that came out of large banks where that division of duties was institutionalized, if you will. And the -- particularly the de novo banks have limited resources. They often deemed someone head of lending. And implicit in that head of lending was you were both the chief cook and bottle washer of all lending, which meant you did the sales of lending and you did the risk management of lending. That was a highly flawed model and I saw that over and over and over again in the 2000s,

as far as it being one of the factors that I think created some of the problems we had in banking.

Q. Mr. Ruffin, when you and I spoke we also talked about a phenomenon that -- well let me back up and do a basic thing here. What is it a -- you were talking about a de novo community bank. What is a de novo community bank -- or was it?

A. Well it's a creation of a new charter, usually because some local investors have decided that that's a legitimate channeling of money and it's got some upside potential. Most of those were done with the idea that eventually they'd be acquired by another bank and they'd get a return on their investment. So that's generally what I'm speaking of when we're talking about a de novo bank. In almost all cases these were formed with the presumption that there needed to be a distinct option or alternative to the larger -- larger banks not necessarily serving the needs of the local community.

Q. So in other words, it was a good policy to have in the marketplace to have these community banks to serve clients that were different than the large traditional banks. Is that what you mean?

A. The United States is the only country in the world that has a community bank system and it is -- when it's done correctly, it is a vital part of entrepreneurism and

particularly to small businesses. Because as the bigger banks get bigger, they depersonalize. They score out through empirical scoring credit decisions to small businesses that are very impersonal and are not any way releasing credit to the small community. There's nothing wrong with the community concept. The concept got tarnished, in my opinion, because it was disproportionately tied to real estate which was the toxin to the financial crisis.

Q. All right. So to get back to what I was about to ask. You and I had also talked about the phenomenon that a lot of these start-up de novo community banks. The bankers who came in to lead them came out of the commercial traditional banks; right?

A. Many did, yes.

Q. And what -- I think you used the phrase that there wasn't a great fit with me. So why was it that in your experience when you saw the commercial bankers who came out and were in these start-up banks just didn't fit well?

A. Well I think they were used to a much more rigid infrastructure, and then they were forced in an environment of being -- doing their own -- having to do many other things that they were used to having other experts do within the bank. And it particularly was

troublesome when it got down to the issue of, I'm both the sales guy lending as well as the risk manager lending. In bigger banks that tended to be much more segregated.

Q. And did you have any opinion as to which side of the commercial banks these executives came from? Did they usually come from the underwriting side or the sales side?

A. They came, usually, from the sales side. And I would hear comments made -- and I use this term occasionally in my presentations that, kind of, to quote Martin Luther King. The reason they love to be in this environment is they were free at last. They felt like they were free from all this bureaucracy and infrastructure that limited their entrepreneurism in banking.

And while I understood that, we all understand to some degree that it also had its downside relative to the lack of controls. Banking, at its heart, is a controlled environment. It has to be a check and balance environment. And I think that's led again to the lack of discipline and lack of controls that were exhibited too often in some of the de novo banks.

Q. Mr. Ruffin, you said that -- I think the phrase you used a few minutes ago was that the exposure to real

estate was one of the toxins of the financial crisis. Is that what you said?
A. Yes.
Q. And I think you said before in other places that there was a great number of factors that all combined to the financial crisis. Correct?
A. Yes.
Q. What about the regulators? What kind of role did you see happening in the mid two-2000s with the FDIC, the Office of Controller of Currency, the Fed, other regulators of banks, specifically in how they interacted with all these thousand community banks.
A. Well, first, I'd like to agree with you. I think there are many constituencies around banking all having some dirt under their fingernails relative to the crisis -- there's no doubt about that. But I think that the regulatory world, in my opinion, is -- particularly the field examiners are an extension of policymakers. And the policy of the regulatory environment in the 2000s, pre-financial crisis, was more lax than it is today; I don't think there's any question about that.
Q. You had talked to me a little bit -- you gave an example of the -- at some point, I think the FDIC proposed some regulations or laws that would affect concentration. Can you tell the judge about that story,

about what happened?

A. Well around 2005 the regulators, to their credit, were being highly concerned about the concentration of real estate in banking, particularly in construction and development lending. About 2005 they came up with what was, I think, initially determined to be a regulatory requirement that you would have no more of a bank's capital than 300% of capital to be devoted to commercial purpose real estate generally, and no more than 100% of your capital associated with construction or development lending explicitly. The banking industry at the time -- this was 2005, again, in the heyday of what I call the mania of lending.

Q. The what of lending?

A. The mania. There was a mania of lending going on at that time. That's why I said it's not just a regulatory problem, it was an industry problem of lending. But at that particular time the trade associations and the bankers themselves raised hell over the fact that we don't need to be told that; please don't throw another regulation on us. And as I understand it, the regulators collectively pulled back a bit and said, well, we're going to offer a guidance as opposed to a hard regulatory, along the lines I just described. They would go in and monitor that and discuss that and publish

that.

At one time, one of the banks in North Carolina that I know did ultimately fail was up in the 650% of its capital tied to real estate. So there were legitimate reasons for the regulators, even three years prior to the financial crisis, for being concerned about the growing concentration of real estate lending in the industry.

Q. When you said that the regulators published a guidance instead of a rule, does that mean -- I mean a rule or regulation is a law. A guidance is, what, a recommendation?

A. Words to that effect. And I had discussions with regulators before and they make that comment back to me, well, that's a guidance and not a regulation. So I think from their perspective they do see the difference between the severity of that. But they were constantly monitoring that with banks and making that part of their regulatory routines and reports and so forth. And, you know, I think it was a very valid concern at the time. But it was -- the banking industry that had pushed back saying we don't need another set of regulations. We need -- maybe guidance is okay but not regulations.

Q. And another question about the regulators. What was your experience with how much the regulators were insisting -- again, we're talking about the 2000s, before

the crash -- insisting it all on a separation or recommending a separation between the underwriting and the production side that you talked about earlier in community banks?

A. I was seeing a number of community banks in the southeast that were being -- it was being accepted that a senior lender model, i.e., one person over lending, was seemingly being accepted by regulatory mindset at the time. They certainly -- in the past, certainly, since the crisis, going back to what I felt was absolute.

There had to be a separation of duties but I was seeing more and more. Part of that was the resource issue. These smaller banks did not have the ability to go out and hire an expensive credit officer as well as an expensive loan production officer. But I did see, wittingly or not, a kind of consent by the regulators to this kind of single model where you had one person in charge of lending.

Q. And I'm sorry. I lost my train of thought.

When you say you saw one person in these community banks in charge of lending, that would be in charge of both the underwriting and the production?

A. Correct.

Q. Mr. Ruffin, I just have a couple of concluding questions.

A. May I interject?
Q. Yes, sir.
A. Just to clarify. In most of those banks they had nominally appropriate processes by which loans got approved through committees, even ultimately to the board of directors. One of my other biases is I've never been an advocate of the board members being in the approval process; I don't think they're qualified for that. That seemed to be a stopgap in a lot of these banks is that, well, we take these large loans all the way to our board of directors.
That would be like, you know, a board of directors at a hospital. They're not qualified to perform surge surgery. My point there is that it's not that there wasn't in place some nominal check and balance. It's just that I saw over and over again the banks had an individual in charge of lending and I think that was a flawed strategy as to what I alluded to before.
Q. And then I think you said -- well one of the problems that fed into that was that these community banks were really small. I mean the staff was sometimes less than ten or 20 people; correct?
A. Correct.
Q. I was going to ask a couple of concluding questions. So I know you give these talks now in various

places. When you do, what is your advice to decision makers who are trying now to judge what happened in the banking -- in the community banking world in the mid-2000s?

A. Well I'm very sensitive to what I call "hindsight bias" or looking through the -- you know, I think there's been overtly conservative lending going on. I think it's not -- it's not -- I use this as an anecdote but -- to talk about this but, you know, Ben Bernanke couldn't get a mortgage. The former Chairman of the Federal Reserve, Ben Bernanke could not get a mortgage under the current rules because he couldn't prove the current income he's getting as a consultant or whatever matched what he wanted to buy because it was not proof of his -- so a lot of the rules that were put into place to try to become more conservative in lending has overly conservatized lending. In some cases even small businesses are not being served. The regulators have even come out in the last two or three months and said that we've got to make sure that small business is given the appropriate funds through lending.

So I do think that a lot of this is a typical pendulum swinging in these crises that tends to be an overreaction -- and it has at some level. And I think anybody objectively would say that despite all the

liquidity that was put into the system by the Federal Reserve, with the quantitative easing, a lot of that money has still not gotten to Main Street in terms of the lending to small business, it just hasn't. So I do talk a lot about that, and I do talk about the fact that bankers themselves were very much problematic.

I remember in the 2008-2009 talking and I said, you know, we did it to ourselves. We advocated our underwriting responsibilities to appraisers to credit scoring agencies and we lost the ability to do our own risk management and underwriting. So I think that, you know, as I said earlier, a lot of players -- a lot of the constituencies in banking have blame to go around for a number of people -- a number of groups, not just one.

Q. Thank you, Mr. Ruffin. Those are the questions I have.

THE COURT: Mr. Scheer, do you have any questions for this witness?

MR. SCHEER: I would like to ask a couple. I think Mr. Devereux has some questions. Is that correct, Mr. Devereux? I would like to ask a couple.

**CROSS-EXAMINATION**

BY MR. SCHEER:

Q. Mr. Ruffin, talk about, if you will, the attitude -- the pervasive attitude regarding real estate value in

the run-up to the crisis.

A. Well there was a general presumption that real estate would always appreciate, that we were in that kind of neverending presumption that -- and the most precise example of that was there was a -- not being done now but was done quite frequently before the crisis, and that was what's called 100% loan to cost. Financing projects, whether it's construction of an individual home or even broader development projects where you would finance 100% of a developer's cost. Under the presumption if you wait another six months or 12 months you'll be back into an appropriate loan to value which would imply some equity in there. The equity being that the market has created equity due to the appreciation of real estate.

That seemed to be the most common aspect, in my opinion, of the lending mania. And it had created, in many cases -- as an aside, I remember in 2004 I was down on the beach and I told my wife to look across the street at this new condo project that had been opened. And it happened to be the Fourth of July and I said, do you see anything unusual about that? And she said no, I know it's new. She said yes. It's the Fourth of July, it's been completed for six months, there's not a light on in any of these units, and my hunch is that there's probably not a stick of furniture in any of these units. People

were buying these units like stock certificates and flipping them because of the appreciation of real estate. And it had become, from an investment perspective, a very attractive way to make money. And I think that's where you had the mania come in.

And you had -- the other aspect of that that I feel strongly about is we had unnaturally low interest rates through much of the middle 2000s that basically created a behavior pattern where it would be natural and rational to go out and borrow money to acquire assets, because in many cases the cost of borrowing money was the lower than the cost of living. So a rational human would incur debt to buy an asset. So a lot of those factors were going on in the marketplace that I think added to the mania, particularly around real estate.

Q. You described the condos at the beach and people having bought them from the developer as it was being built, I gather. Right? And treating that almost like a stock because of the -- to use Mr. Greenspan's terminology, "the irrational exuberance of the market." Had Mr. Newton been wrong and the apple had not fallen on his head to prove that gravity was true. Had the belief at that time that you've just testified to that real estate was essentially going to always go up, would there have been any problem?

Cross - Ruffin

If real estate was always going to climb like it was climbing throughout the 2000s and up until 2007 -- I know it's a ridiculous hypothetical because the apple did clunk him on the head. But was there a problem with it if real estate just steadily did what the market believed the real estate was going to do, which was go up, up, up, up without a crash?

A. No. There was always talk that real estate's a finite commodity. It's not created, like, in a manufacturing process. But the flip of that is that, of course, we all know what bubbles are.

Q. Yes.

A. They always burst.

Q. You used the phrase "loan to cost." Now we know about the 75% loan to value talk --

A. Yes.

Q. -- within the banking industry, and I think it's even alleged in the indictment in this case. You've reviewed the indictment in this case; right?

A. I have.

Q. You used the phrase "loan to cost," and I just want to ask you to clarify it. Because if a builder is building out a piece of real estate and selling off the condo units or the lots for future development, like at Seven Falls. If they're building it and their costs are

their costs, why not -- and we talk about 75% loan to value. Why not call it 100% to value loans? You've used the phrase 100% loan to cost. Why not just say 100% loan to value?
A. Well value in those circumstances imply future recognition of value. The marketplace has to take hold. It has to -- for instance, appraisals that were done and credit decisions made in those days would differentiate cost in value. But the bets were being made that because of constant appreciation of value that within six months or 12 months you'd be in a legitimate loan to value. But that's a bet on the future. And the issue is, of course, is, is there skin in the game today by the developer or the borrower? And that's the difference I think.
Q. The bet was being made that loan to cost would become loan to value --
A. Correct.
Q. -- by virtue of the neverending increase --
A. Correct.
Q. -- in the value of the limited commodity which was real estate?
A. And that was pervasive across the industry, yes.
Q. The bet was made by the investors, by the buyer of that piece of real estate from the developer. Correct?
A. Yes. Correct.

Cross - Ruffin

Q. The bet that loan to cost would become actual value was made by the developers themselves. Correct?
A. Correct.
Q. That bet was also made by the banks who loaned on these developments as a whole. Correct?
A. Correct.
Q. Made by the lenders who financed the purchases from those -- by buyers from the developers. Correct?
A. Correct.
Q. Made by the banks who loaned to people who were just investing in that unit as they bought it from the developer. Correct?
A. Correct.
Q. That bet was made by the appraisers whose appraisals were put into the loan portfolio, the loan packet, when a piece of property was sold. Correct?
A. Correct.
Q. Or development was valued for purposes of a larger, a more universal loan. Correct?
A. Correct.
Q. And is it fair to say that that bet was also made by the regulators when they didn't force the policymakers to see the problem and create an actual regulation that limited this risk, as opposed to just accepting the much watered down, "we'll deal with this by way of guidance."

Cross - Ruffin

That bet was placed by the regulators in effect for not pushing harder on what they knew to be the prudent course. Isn't that fair?
A. There are aspects of that that are accurate.
Q. I want to talk about a couple of other aspects of the market at that time with you. "Loan to one borrower" is another phrase which is used in banking, and it's a portion of the allegations in this indictment. Explain to us what that is and how it's supposed to be used.
A. In the general terms, loans to one borrower are statutory requirements that any bank is limited to putting any more than 15% of its capital base at risk to any one borrower. There are nuances to that on a state to state basis depending on what kind of banks charter they are. But it's basically that 15% of the bank's capital base cannot be bet on one borrower.
Q. Okay. Now the devil in the detail here, one might say, as to this piece of the Seven Falls case had to do with what the definition of "one borrower" was.
A. Yes.
Q. And again, you've read the indictment.
A. Yes.
Q. Are you generally familiar with the issues in this case from the indictment just as alleged by the government with the issues surrounding the definition of

"one borrower?"

A. Yes.

Q. Okay. Could you just -- could you start off by -- I don't have a good next question, so if you'd comment on your understanding of it I might form one.

A. Well the issue as I see it --

MR. SAVAGE: Your Honor, at this point I'm going to object. I don't think the witness should just be allowed to comment. If there's a specific question that's relative to this case then we would ask that counsel ask one, rather than ask just general questions about loans to one borrower. My understanding was that the defendants were not objecting to the findings in the presentence report of which loans to one borrower and its violations are certainly one of the factors.

THE COURT: Well as to the specific objection regarding the form of that question, it's sustained.

MR. SCHEER: Yes, Your Honor. Thank you.

BY MR. SCHEER:

Q. Mr. Ruffin, are you familiar with what the technical definition of loan to one borrower is, as we sit here today?

A. Yes.

Q. Would you tell us what that is?

A. It's that you are not to put more than 15% of your

capital at risk to any one borrower.

Q. My question -- I'm sorry. I misspoke. Are you familiar with the technical definition of what "one borrower" is or how "one borrower" is defined?

A. Well that is how some of the differences and the nuances kick in.

Q. Yes, sir. Can you -- well and I'm trying to start off with, where are we today in this far more regulated and far more defined environment?

A. Well prior to the financial crisis it was my understanding that the OCC, or the Office of Controller of the Currency, which is an arm of the Federal Reserve -- of the Treasury Department -- and they're one of three of the primary regulators: The Fed, the FDIC, and the OCC -- currently is that they had traditionally a very conservative interpretation of that, which meant that if there was a common interest litmus test being applied which meant it doesn't matter whether the bank chose to release these people as guarantors or co-borrowers -- in other words, non-recourse lending or not -- then the OCC would interpret that as exposure.

If their primary income arose or was tied to that enterprise or that business, it didn't matter whether the bank chose to make that a nonrecourse loan or not. We are familiar with a number of other non-OCC banks

pre-financial crisis that the release of a guarantor effectively gave the bank, in their minds, the ability to stay under the loans to one borrower because they had, in some piecemeal fashion, decided to release this particular loan to this guarantor or not. That was an inconsistency among the regulators. It has now been -- everything I can glean is that post financial crisis all the regulators effectively enforced the original OCC interpretation of that.

Q. What would you have said to a community bank that you were -- your company was providing this very kind of guidance to over a hundred community banks leading up to the crisis; is that correct?

A. Yes.

Q. What would you have told those bankers about the "state of the state" as to the question of what one borrower was defined as.

MR. SAVAGE: Objection. Your Honor, I'm going to object to the foundation and relevance. I think the loans to one borrower, as we know from the trial in this case, is a state statute. So anything that is not related to the loans to one borrower limit in the state of North Carolina would be irrelevant.

THE COURT: Where are we going with this, Mr. Scheer?

MR. SCHEER: Well Your Honor, we're at sentencing here and the question would be -- there's lots of pieces here that the government has alleged constitute conspiratorial intentional frauds. And I think that with respect to the 3553(a) factors, the first one up is the nature of the crime and the nature of the crime in effect. And here one piece is the government's allegation that everybody understood loan to one borrower and there were intentional acts committed to skirt that clear regulatory requirement. I'd submit that where we're going is there was no such thing.

There was no clear understanding amongst community banks with respect to what one borrower was and what would effectively create a proper release of one party to create, if you will, more space for the bank to lend to another individual. There wasn't such a clear delineation. And as to that piece of this alleged fraud Mr. Ruffin has tremendous experience in what bankers believe -- in other words -- let me put it another way, Your Honor.

If you're going to commit an intentional fraud, you have to think you need to. You have to think that what the course that you're on as to a particular transaction, for instance in this case, is wrongful. And you've got -- you've got to deceive somebody about it as

to the question of loan to one borrower. It's my contention that the typical community banks out there -- to include the banks that are involved in this case -- didn't understand what the government has set down now in respect as some sort of black letter rule that didn't exist.

THE COURT: So are you arguing there isn't a factual basis for the plea regarding your client?

MR. SCHEER: No, Your Honor. I'm arguing that this aspect -- because the government has alleged a number of bases for misrepresentations, I'm arguing that this and some other aspects of it were not the frauds -- there wasn't a driver to, if you will, lie or deceive about that aspect of it, because the definition of loan to one borrower in this case was not -- I hesitate to say clear. I don't think it really existed for purposes of what it takes to form intent to defraud.

THE COURT: So your position is that the factual basis for the plea regarding the fraud, or the conspiracy to commit fraud, is actually narrower than the contention of the government.

MR. SCHEER: Yes, Your Honor, much better put than I had. And that -- and by the way, if the Court looks at the factual basis for Mr. Chapman's purposes, that would be one of several places that we did not come

in saying yes, that was part of the fraudulent conspiracy that Mr. Chapman was party to. Again, I think that, if you will, what we're going to get to at sentencing is I'm going to be arguing there were frauds. They were far more limited than the broad intent -- excuse me, the broad conspiratorial -- there's lots of things that we've got to do to get around what was a -- what were clear, knowing regulations that would have otherwise prevented it.

So, if you will, the nature of the crime is narrower -- and considerably so than what the government has alleged -- while the damage is and those aspects of Mr. Chapman's involvement in it which he was guilty of fraud in. The damages may be the same, but the nature of the acts are far more limited and that's part of our argument for the 3553(a) factors in considering the scope, if you will, of my client's conduct.

THE COURT: The objection's overruled. Mr. Scheer, please don't belabor the point.

Mr. Savage, you can cross-examine this witness about the statute.

MR. SAVAGE: Thank you, Your Honor.

BY MR. SCHEER:

Q. In an effort to just draw our attention more closely. Based on your experience, the advice that you

were giving to banks in the run-up to the crisis in 2008, in particular, was the idea of the definition of what a single borrower under LOPOB was, was it clearly understood in the banks?

A. It was clearly understood in some of our client banks that they had the option of pulling that loan guarantee or direct borrower legal obligation off the table.

Q. And thereby remove them from -- that person from the 15%?

A. Yes. And why this was pertinent to me as a company was that we do a tremendous amount of loan review work, which means we go in and look at loans and -- from a quality control standpoint. And we used to have discussions pre-financial crisis. I understand you've got the legal ability or technical ability to pull this loan off of this set of loans you've made to this group of people off the table. And because of where you are from a regulatory perspective you're exempt from that broader perspective. But is this really the appropriate safety and soundness approach you should be taking? Because it did have in my -- in our opinion, in many cases, risk to the bank that if this default occurred by this borrower or group of borrowers then they've effectively let this borrower or group of borrowers or

guarantors off the hook because of releasing that guarantee or that direct obligation just to get on to the loans to one borrower.

Q. So is it -- is what you're saying that it was, for these community banks in North Carolina, understood to be regulatory -- a regulatory problem from a regulatory standpoint to make these transactions to create more space under the loan to one borrower rule?

MR. SAVAGE: Objection, Your Honor, foundation as to banks in North Carolina. Which banks?

THE COURT: Well wait a minute. There's an objection. As to that objection, it is sustained.

Mr. Scheer, get to the point, particularly with regard to this. Unless I'm misunderstanding your question, I feel like you're beating a dead horse.

MR. SCHEER: You're the consumer, Your Honor, and I'll move on. Thank you.

BY MR. SCHEER:

Q. Are you familiar with the term "a liquidity accommodation?"

A. Yes.

Q. And if you will, tell us what that is.

A. It's methods by which developers or owners of projects would look for funds extra to banking -- formal banking funding of the loan.

Cross - Ruffin

Q. And specifically, what was the method?

A. It could be loans from relatives or investors that invest on the side, or it could be wrapped up into loan programs, lot programs. It could actually be builders that come in and look at the speculative options that they saw the upside for them building homes in a development and they may, as a deterrent, take down a bunch of lots. And they do that by giving the developer funds. And that's a liquidity event for the developer, in addition to what they're getting from the bank proper.

Q. And what was the -- describe briefly what the need for liquidity was. At what point in a development were these kind of accommodations being made?

A. Well the development is a very complex situation and it has an element of a shell game to it. If you don't follow -- and that's honestly where I think the bankers fell down on it. They didn't do their due diligence in understanding where those funds were going, and I think that oftentimes gets to the issue of the timing of the liquidity and the needs to develop out the roads and the infrastructure and the water and the sewer and things of that nature. While you can spec that out on the front end of a development, the timing of when those costs are incurred is what creates these liquidity issues.

Q. Okay. And you mentioned lot programs as one of the accommodations with regard to liquidity -- the needs for liquidity you just described. What is, in your understanding or experience, a "lot program?"
A. A lot program could be a packages that are given to either builders or to consumers or to friendly investors that say, in lieu of some investment you make with us and effectively into this project, we'll give you these lots.
Q. Okay. And in all cases were the lots contemplated to be kept by an entity? Let me start off in the situation where these were friendly investors. As you've just said, was it contemplated in all cases that the friendly investor was actually going to keep and possess and themselves either develop or resell the lot?
MR. SAVAGE: Objection, Your Honor, foundation and relevance. What investors? What lots? What circumstances?
THE COURT: Well we don't have a jury here and I suppose technically the rules of evidence don't apply. Overruled.
Answer the question if you can.
THE WITNESS: These were often lots -- or the participants in the lot program in many cases or in most cases probably were not what I'd call end consumers.

They weren't the consumer expecting to build a home and live there. As I alluded to before, real estate had become almost a commodity of investment and sometimes people were using it and thinking of it in those terms. If I hold these lots for six months or a year I might have appreciation that comes with it, and then I can turn that over to other groups.

BY MR. SCHEER:

Q. Okay. Was it also sometimes sold back to the developer for resell?

A. Yeah.

Q. And sometimes the sales contract provided for a buy back by the developer?

A. Correct.

Q. And this lot -- the idea of a lot program, was that -- was that a commonly known phrase in the community banking world?

A. It, along with interest carry and this type of thing, was just not uncommon at all with developers.

Q. Okay.

A. It came with the territory.

Q. Thank you very much, Mr. Ruffin. I don't have any further questions.

THE COURT: Mr. Devereux, do you have any questions for this witness?

MR. DEVEREUX: I do, Your Honor.

**CROSS-EXAMINATION**

BY MR. DEVEREUX:

Q. Good morning, Mr. Ruffin. Mr. Ruffin, in response to a question from Mr. Scheer you testified that you have studied the Bill of Indictment in this case. Is that correct?

A. Some time ago, yes.

Q. Okay. And the Bill of Indictment makes certain assumptions about the practices in the commercial real estate development world of the 2006-2010 period. Would you comment on those assumptions for us, please, briefly?

A. The assumptions of the market as a whole?

Q. No, the assumptions in the Bill of Indictment.

A. Well I think there were elements, if I may, that seemed to have some hindsight bias to it around what we think of today as either pushing the envelope or being inappropriate business strategies around development lending, and much of that was in retrospect pushing the envelope. But it was not necessarily uncommon and it was certainly not unique from what I got out of the indictment at that particular project, particularly in things like lot loans. The so-called comment about straw loans, that is certainly a case where it could be fraudulent but, you know, straw loans, if you take it and

further delineate what that may mean.

I've seen cases where relatives -- other people have come in that are knowledgeable about the project and step up for loans and, particularly in events where there's a project comes under stress, you often have builders and borrowers reach out to associates and acquaintances to come in and try to take some lending liability, if you will, or borrowing liability to help out the project.

Q. And let me stop you right there. The straw borrower/straw loan concept is certainly central to this prosecution. What do you understand a straw borrower to be?

A. Well in a pejorative sense I'd just say it's just a shadow borrower that's brought in to look like a legitimate borrower. And in that case it's -- but I also would hasten to say that's incumbent on the bank to understand that. Even if it's being presented to the bank by the developer or the borrower, it's clearly incumbent on the banker to be able to weave that out and be able to differentiate between what's legitimate borrowing and not.

Q. In the pejorative sense, does the straw borrower definition include some camouflage of the source of repayment? Is that -- isn't that what banks are really

looking for ultimately: How are we going to get paid back?
A. Yes.
Q. And how does the source of the disclosure or the bank's ability to reassure itself about the source of repayment, how does that relate to the straw borrow borrowing notion? Why is straw borrowing bad?
A. If the so-called straw borrower is legitimate and is underwritten properly by the bank it in and of itself is not a negative. It should not be construed as a negative.
Q. The question that Mr. Scheer asked you a borrower for the benefit of another is just another way of say organize can be another way of saying -- describing a straw boar roar?
A. Yeah. Under stress I've seen for years and years borrowers bring in relatives, associates, co-investors to help buttress or shore up a project that was under stress, and oftentimes that's bringing this individual into a bank and saying would you consider borrowing money under your name and then let me have the funds to inject into this project?
Q. How do you cross the line from being a legitimate borrower for the benefit of another and become an illegal straw borrower?

MR. SAVAGE: Your Honor, we're going to object at this point. It's clearly a question of law. It's not a matter of practice. This would be a question for the Court, and it's a matter that's already settled by the plea in this case.

THE COURT: How is that not a legal determination?

MR. DEVEREUX: Your Honor, that's a great question. I've never seen -- the term is used poetically throughout the Bill of Indictment. I don't see it anywhere in the General Statutes or the code or the United States Code. I don't think it is a legal definition. It's not used that way.

THE COURT: Where the line is between what is legitimate and legal and what is supposedly illegitimate and illegal, isn't that -- by definition, is that not a legal determination?

MR. DEVEREUX: Well I suppose I could ask it another way.

THE COURT: Why don't we try that?

BY MR. DEVEREUX:

Q. If you were -- let me say something to you. I think we understand this, Mr. Ruffin. I approached you originally and you were Mr. Cashion's witness way back when. And you understand you and I haven't spoken in some time. Mr. Cashion has pled guilty and, in fact,

has testified. So his behavior's very well circumscribed in this matter and known to the Court. Nonetheless, the question of who's a straw borrower and who's not and when they're straw borrowers and when they're not certainly figures into this sentencing situation.

So I would ask you, in your role as a consultant to community banks, what would you caution a bank to avoid in order to have someone not -- someone legitimately be a borrower for the benefit of another but not a straw borrower?

A. If there was clear evidence as to their awareness of what the funds were -- it all starts with the purpose. That's the most fundamental part of lending is understanding and tracing the purpose of the loan. And that answers most of the question I believe.

Q. So if the purpose is somehow -- if the lender is somehow disguised in the purpose he's a straw borrower -- I'm sorry. If the borrowers --

A. Correct.

Q. Your Honor, if I can just have one moment?

THE COURT: You may.

BY MR. DEVEREUX:

Q. The term "hard money lender" has come up, I believe, in the Bill of Indictment and certainly in the testimony, and perhaps in Mr. Scheer's questions. Can

you define that for us, Mr. Ruffin?
A. Hard money, again, would be kind of the extra bank environment, whether it be investors, friends, associates, that could provide liquidity, extra, the banking environment. An example might be in current environment where you have high growth companies that take a commercial bank to its extent of comfort and then have mezzanine lenders come in and add more debt into the picture. They would be considered hard money lenders. They're going to get a higher rate of return, but they've also got a higher risk because they're now in a secondary position. It's kind of like a subordinated debt circumstance.
Q. And hard money lenders are generally private individuals?
A. Yes.
Q. And by definition almost unregulated?
A. Correct.
Q. Are hard money lenders always putting up their own assets, or sometimes they're lenders in their own liquidity, their own ability to borrow?
A. Both. I've seen it in both circumstances.
Q. And the hard money lender and a liquidity accommodater are essentially the same thing?
A. Yes. I see that as very much the same purpose.

Q. In the reports, sort of postmortem -- let's say an autopsy of Pisgah Community Bank -- there's discussion about leverage deposits. Would you describe for us or define that for us?

A. Leverage deposits are in some other pejorative term known as "hot money." It's, basically, much of the de novo banking industry in many ways got funded, I think, with this hot money which is money derived from the Internet and they're not conventional local depositors of the bank. The banks tend to have obviously paid a premium for that but it did provide the liquidity to denote many of the de novo banks to get started.

Q. A conventional bank that began, say, in Asheville in 1910 and would grow its deposits over a century?

A. Right.

Q. Mom and pop would come in and deposit their paycheck and stuff?

A. Right.

Q. A de novo bank, it's all about deposits. Is that fair to say?

A. Right. Obviously, the money which you lend to borrowers generally comes primarily from deposits.

Q. Brokers' deposits are not from mom and pop. They're from somewhere around the country.

A. Correct. And the regulators do have -- and way

before the financial crisis I think did a good job of keeping an eye on that. And there was a lot of kind of prescriptive warnings being issued about you're way too much into broker deposits and things like that because your dependence on them is inordinate.

Q. The broker who brokers these deposits keeps an eye on interest rates and moves money around the country and may never have been to Asheville, may never have darkened the doors of Pisgah bank to make his deposit.

A. That is correct.

Q. In order to offer those attractive rates and attract and retain broker deposits local banks have to take other risks -- investment risks, for example?

A. They're paying a higher premium for that money.

Q. In order to do that they might be --

A. Correct.

Q. -- more dependent on real estate -- speculative real estate ventures than they should be?

A. Correct.

Q. So it's a vicious cycle.

A. Correct.

Q. And Pisgah Community Bank was heavily dependent upon broker deposits; is that correct?

A. That's my recollection. It's important to note we've never done work for Pisgah Community Bank, never

seen their loan portfolio directly, but it was my understanding.

Q. You have consulted some, though, with Capital Bancorp; is that right?

A. Yes. The umbrella organization that had created the Capital Bank franchise, I was aware of their business model and we had done work on at least two other banks that were part of their so-called franchise network. So I was quite aware of how they operated, yes.

Q. And utilizing broker deposits was part of that model.

A. Correct.

Q. Those are my questions, Your Honor.

THE COURT: Mr. Savage, do you have cross-examination?

MR. SAVAGE: Your Honor, if we could have a brief -- we've covered a lot of material in the last hour and a half. If I could have ten minutes to organize this I may be in a better fashion -- I think I may be more efficient.

THE COURT: How long do you expect your cross-examination is going to take?

MR. SAVAGE: I think it's going to take an hour. Or in the event we stop early I'll be calling another witness, in light of the scope of the direct.

THE COURT: I didn't quite understand you.

MR. SAVAGE: It will be at least -- it would be about an hour, but perhaps it may be shorter than an hour in which case then I would be ready to call another witness if this witness is not capable of answering the questions I'm going to put to him on cross.

THE COURT: So you expect your cross-examination and another witness, if necessary, to take about an hour?

MR. SAVAGE: Yes, Your Honor.

THE COURT: Okay. Because I do have other hearings this afternoon you will probably be limited to about noon.

MR. SAVAGE: Yes, Your Honor. I'll finish by noon.

THE COURT: We'll go ahead and take the morning break. Ten minutes, please, marshal.

(Off the record at 10:25 a.m.)

(On the record at 10:33 a.m.)

THE COURT: Mr. Savage, are you ready to proceed?

MR. SAVAGE: Yes, Your Honor.

THE COURT: You may.

**CROSS-EXAMINATION**

BY MR. SAVAGE:

Q. Good morning, Mr. Ruffin.

A. Good morning.

Cross - Ruffin

Q. Mr. Ruffin, can you see on the screen before you a screen shot from a page at your website, Credit Risk Management, LLC?
A. I do not. Yes.
Q. Okay. And I'd mark that as Sentencing Exhibit No. 1, Your Honor, with today's date. Just to tell the Court a little bit about your web page. Your web page is pretty comprehensive, is it not?
A. Yes.
Q. It includes several videos and a lot about your philosophy of how you should manage risk --
A. Correct.
Q. -- in various banks. And not just community banks but any type of bank.
A. Yes.
Q. It describes services you offer regarding mergers and the type of due diligence you might perform as an expert on behalf of a bank or group of bankers?
A. That is correct.
Q. There are several videos in which you appear and you describe at length how you go about doing this analysis. And in that, you describe a thing called "credit risk life cycle." Is that right?
A. That is correct.
Q. Let me show you what I've marked as Sentencing

Exhibit No. 2. And I'll ask you -- and there were several slides on that, but that first page is a description of what you would call your "credit life cycle" --

A. Correct.

Q. -- which is the basis of your review and philosophy.

A. That is correct.

Q. Okay. So it is not necessarily a matter how many people do it but the fact that this cycle or this process is completed.

A. That is correct.

Q. Right. And the various things on the outer ring there: Credit leader, CM -- CRMA and ERMA, what are those?

A. Credit leader is the transaction tool for more traditional underwriting of a given loan request. CRMA is Credit Risk Management Analysis and is really a tool that we developed in the financial crisis to extrapolate macro risk. Taking the kind of the sum of the parts of all the individual loan transactions and depicting a risk profile of a bank as a whole.

Q. It would be fair to say that these types of underwriting programs, or variations of them, were available even before 2008?

A. That is correct.

Q. At various banks they could be purchased commercially or off your website; correct?

A. Absolutely.

Q. Then you go through the underwriting performance testing and all of that. I'm not going to cover that in detail but, basically, what is underwriting?

A. Underwriting should be the determination of the risk and the opportunity that the bank has to make this loan.

Q. Right. So the bank is going to be looking at not only the profit it can make on the loan by interest but it should be underwriting the loan, like evaluating how risky is this?

A. Yes.

Q. In one of your videos you talk a little bit about underwriting; is that right?

A. Yes.

Q. I think that one of the things you said is -- and tell me if I'm wrong -- that of course it all comes down to the integrity of the debt. Is that a fair quote?

A. Yes.

Q. Okay. So if you have a banker who wants to lie, none of this works no matter how many people are in the bank. Correct?

A. Credibility is the life blood of the entire like life cycle.

Q. I think that's your word, "life blood." So if the commercial loan officers in your big bank at Citizens Bank or First Union are not putting into the loan memorandum all of the crucial elements of the loan and they're doing it willfully and on purpose, that's going to subvert the entire process.

A. Correct.

Q. And the bank could be -- even a large bank could make wrong decisions.

A. Correct.

Q. Okay. Now you mentioned before that you weren't particularly familiar with this bank, Pisgah Community Bank; is that correct? Have you ever examined it or been involved in it?

A. Have not.

Q. Let me show you what was admitted at trial as Government's Exhibit 1251. Can you see 1251? It's the organizational chart of the Pisgah Community Bank on June 11th 2009.

A. Yes.

Q. Okay.

THE COURT: Mr. Savage, when you -- so the record is clear, when you're saying "at trial," it isn't a trial

Cross - Ruffin

for any of these defendants.

MR. SAVAGE: That's correct, Your Honor.

THE COURT: It's for Mr. Vinson.

MR. SAVAGE: Would Your Honor prefer that I remark it?

THE COURT: So long as the record is clear that it's Exhibit 1251 from what.

MR. SAVAGE: Yes, Your Honor.

MR. FIALKO: If I may, I'd love it if we could remark it.

MR. SAVAGE: Your Honor, at this time -- and this is an electronic exhibit. What I'll do is keep a list. I will refer to it, just for the sake of this, and just to expedite things, as Exhibit 1251 from the United States versus Vinson and which I will remark as Sentencing Exhibit 3 with today's date.

THE COURT: You may proceed in that manner.

MR. SAVAGE: Thank you, Your Honor.

BY MR. SAVAGE:

Q. Can you see what has been marked as Exhibit 1251 and also Exhibit 3?

A. I can.

Q. Okay. Did you know Mr. Craig Gourlay?

A. I do not.

Q. Okay. Do you know Mr. David Smith, the

Cross - Ruffin

commercial loan officer?
A. No.
Q. How about Mr. Ted Durham, the president and CEO of the Pisgah Community Bank?
A. Just this morning for the first time, yes.
Q. Do you know anything about how they conducted their operations in their bank between the time it was created in 2008 and the time that it failed or the time they left the bank in 2010?
A. Only through a general understanding of what this chart depicts and a general knowledge of the Capital approach -- Capital Bancorp approach to many of their affiliated banks.
Q. Capital Bancorp being the 51% shareholder in this bank?
A. Correct. Of Lansing, Michigan, right.
Q. Okay. In this regard -- first of all, the Senior Vice President and Chief Credit Officer, Mr. Gourlay, would be the primary responsibility for underwriting loans; is that correct?
A. That's what it says. Yes. The chief credit officer, yes.
Q. But under this chart or under any other community bank is Mr. Gourlay without supervision, rules or oversight?

MR. FIALKO: Objection.

THE COURT: Was there an objection?

MR. FIALKO: Yes.

THE COURT: What's the basis?

MR. FIALKO: I think it's a compound question. Under Pisgah or under all other banks?

THE COURT: Well as to the form of the question that's sustained.

BY MR. SAVAGE:

Q. Are you familiar of the role that a COO plays in a community bank, based on your expertise and reviewing of all the banks that you've talked about in the hour that you were here this morning?

A. COO as in Mr. Gourlay?

Q. Yes. What does a COO do?

A. This says Chief Credit Officer and Senior Vice President. Was he COO as well Chief Operating Officer?

Q. I'm sorry, Chief Credit Officer, CCO. I mispronounced it.

A. Yeah. a Chief Credit Officer tends to be the risk manager of the bank, yes, of the loan portfolio. Traditionally, that term is applied to the risk officer, not the lending officer.

Q. Who does the CCO report to in most community banks and in this one in particular?

Cross - Ruffin

A. To the CEO, typically.
Q. The CEO does have the responsibility for overseeing the underwriting and the cycle of loans that we just discussed?
A. Correct.
Q. In fact, in your model, would not the CEO be the person who would be providing the separation, the looking after both the profits of the bank and the safety of the bank? Isn't it that person's responsibility?
A. The CEO typically in community banks, in my perspective, provides somewhat the arbiter of the production versus the risk.
Q. Okay. And of course it's all going to come down to whether or not the bank had a proper lending policy; is that correct?
A. Correct.
Q. In your view, do you know whether or not Pisgah had a lending policy?
A. I do not.
Q. Okay. Well let me show you what has been marked as -- I'm going to show you what was marked in the Vinson Trial as 1,253 and what we will refer to for the purposes of this hearing as Sentencing Exhibit No. 4. What role does a credit policy play in any financial institution?
A. It's a declaration of philosophy that can or

cannot or may or may not be worth the paper it's written on.

Q. Well is it not supposed to guide the officers of the bank on how they're supposed to act with respect to lending?

A. It is. It's designed for that.

Q. Right. Is a credit policy something that is approved by the board of directors, usually?

A. Yes.

Q. There may be things that are discretionary in them, but there are also some things that are not discretionary. Correct?

A. Correct.

Q. And in a credit policy if the members of the staff, the executives of the bank, deliberately and knowingly violate that credit policy then they have misappropriated the bank's funds. They've lent them in a way that the board never authorized.

MR. FIALKO: Objection to legal conclusion, Your Honor.

THE COURT: Mr. Fialko, I'm going to need you to pull a microphone over closer to you because it's hard for me to tell whether or not you're even saying anything.

MR. FIALKO: I will do better, Your Honor. I

said objection. It's calling for a legal conclusion, Your Honor.

THE COURT: That's sustained.

BY MR. SAVAGE:

Q. Let's go to a couple of things in the policy that we talked about. And we're going to go to the third page of the credit policy for the Pisgah Community Bank, and it would be 110. If we can enlarge the very first paragraph. This is a -- this talks about the lending activities of any one borrower to be in the bank's house limit and that defines a bank's house limit. Is that a common term in banking, a bank's house limit?

A. Yes. Many banks will be very liberal or conservative in the house limit. Some approach the legal lending limit, which is the 15% threshold, or others have even half of the legal lending limit as their in house limit. So that's quite out there in terms of -- at least before the financial crisis was very varied bank to bank.

Q. Okay. And in this case the house limit was in fact the bank's legal lending limit, including regulation which is not at issue here.

A. Right.

Q. And the bank -- having lived in Raleigh for many years, you would be aware of course that it's not just any rule -- it's not an OCC rule. The North Carolina

statute provides specifically for a loans to one borrower limit, does it not? Are you familiar with that statute?
A. Generally speaking, yes.
Q. Okay. It would be section -- General Statute Section 53-48. And you're aware that it says the total loans and extension of credits, both direct and indirect, by a bank to a person other than a municipal corporation for money borrowed, including liabilities of a firm of the several or the several members thereof outstanding at one time and fully secured shall not exceed 15%. Right? Do you recognize that rule?
A. I do recognize the rule.
Q. Okay. And it's not -- it's pretty specific, is it not?
A. It is.
Q. Okay. And in fact, it goes on in the second section, (d), to define a person. A person shall be deemed to include an individual, corporation, partnership, trust association, joint venture, pool, syndicate, sole proprietorship, unincorporated organizations, or any other form of entity. Very broad. Correct?
A. Correct.
Q. So when you're calculating the loan to one borrower limit, as Mr. Scheer would suggest, you're

Cross - Ruffin

going to conclude any credits in that bank that are going to be going to a single entity or person as liberally defined in the statute. Right?
A. Correct.
Q. And you're going to do that not just in general but this is a North Carolina statute. It's not discretionary, is it?
A. The way it's written, it is not discretionary. In practice it appeared to be.
Q. It appeared to be discretionary.
A. Yes, in form.
Q. Now this is a very basic concept to bank, is it not?
A. Yes.
Q. But you do not put all your eggs in one basket --
A. Right.
Q. -- especially when the bank that you're running is lending money from shareholders and other depositors and is insured by the good people of the United States of America.
A. Correct.
Q. It's other people's money.
A. Correct.
Q. Okay. So the bankers have a fiduciary duty not just to themselves but to their shareholders and

depositors.

A. Correct.

Q. So when looking at these credits, is it enough to simply say I know this borrower? He's of good character. Is that an adequate underwriting?

A. Not at all.

Q. Now you mentioned earlier that in your experience a lot of bankers in the de novo community banks prior to 2008, when we had de novo banks, came from the commercial lending side. Correct?

A. Correct.

Q. These bankers still knew the basic rules, did they not?

A. Correct.

Q. Okay. And in fact, in order to be the president of a bank in North Carolina at a de novo bank, there's quite a rigorous vetting policy isn't there?

A. That is true.

Q. Okay.

A. Yes.

Q. In fact, are you aware that the Pisgah bank, the FDIC and NCCOB had two days of hearings here in Asheville in order to qualify these officers and this bank before it became a bank?

A. No, I was not aware of that.

Cross - Ruffin

Q. Okay. You were aware that the bank does hold hearings?
A. Yes, but not specific to this instance.
Q. And if the individual who is nominated as the CEO of a bank was found to be completely deficient in underwriting or unable or unwilling to carry out basic policies such as this statute, in your experience would this Mr. Grace, who was then the director of new banks, approve that person?
A. No.
Q. Okay. And in fact, Mr. Grace, who is now the Banking Commissioner, would have conducted and indeed have conducted various training before and after this bank was formed.
MR. FIALKO: Objection. Personal knowledge.
BY MR. SAVAGE:
Q. Do you know Mr. Grace?
A. Oh, yes.
Q. Okay. And you're familiar with the Director's Program?
A. Yes. I'm speaking -- that's the one I was speaking -- that I was being invited to speak in June -- July to. Yes.
Q. Okay. Were you aware and do you know that -- were you teaching at the Director's college in August of 2009?

A. I was.

Q. Okay. Let me show you what I'll mark as Government's Exhibit -- Sentencing Exhibit 5. This is an e-mail from Mr. Durham to a group of people. Did you know a person by the name of Melanie Ford at the Banking Commission?

A. Yes. She coordinates the agenda and the speakers --

Q. Okay.

A. -- at the Director's college.

Q. In this particular e-mail Mr. Durham is asking Ms. Ford if she has his copy of the Director's College book session three. Right? So in that particular part of the Director's College would you have taught some of the very same principles that you talked about here today about underwriting and risk management and a need to be careful with other people's money?

MR. FIALKO: Your Honor, I object at this point. I know the cross-examination is allowed to go and have a lot of leeway but these are not subjects that I asked my client -- or excuse me -- my witness about at all on my direct examination. I think we're going far afield from what he testified when I asked him questions which were largely about the banking industry and not specifically about my client.

THE COURT: So are you wanting Mr. Savage to call Mr. Ruffin back as his own witness later? Is that what you're asking?

MR. FIALKO: No, sir.

THE COURT: Well under those circumstances then the objection is overruled. I'll give a fair amount of leeway as to what can be covered on cross-examination.

MR. FIALKO: Yes, sir.

BY MR. SAVAGE:

Q. Now you earlier answered some questions about lot loans and you talked about what was in the indictment. When was the last time you read the indictment in this matter?

A. It was on or about August or September of 2013.

Q. Okay. So it's been a little while.

A. Yes.

Q. And you're familiar with the paragraph 31 which defines the term "straw borrower" as used in the indictment as a person who acts knowingly or unknowingly as a nominee for the actual borrower on a loan in order to hide and disguise the true identity and motivation of the actual borrower because the true or actual borrower cannot obtain a loan in his or her name. So there are different kinds of straw borrowers; right?

A. Correct.

Q. This kind of straw borrower is the latter one that you referred to which is you cannot use a straw borrower to deceive or hide the true purpose of the loan, can you?
A. No. I believe that the purpose is the beginning point of the credibility issue and all.
Q. The purpose is the alpha and the omega of your analysis. And if we went through every one of those slides on Exhibit 2 that's where we would wind up.
Hypothetically, if a group of people involved -- hard money lenders or investors -- in a real estate transaction come into a bank and they say I need $2.5 million for a bridge loan in order to carry us over some bad times, say, in 2008, and the bank says no we can't do that because our legal lending limit is only $1.1 million and nobody's going to take this participation. That, from your view, would be a good no wouldn't it?
A. A good what?
Q. You couldn't do a loan for $2.5 million even if you wanted to. It would exceed -- if you lending limit is $1.1 million --
A. Under the technical definition of loans to one borrower that is correct.
Q. Okay. Under the North Carolina General Statute?
A. Fair.
Q. Right. So now if you come back and say, but if

you break this up into individual lot loans and I'll give you that money and we'll break it up into these individual loans and I'll guarantee to these individual buyers that I'll buy their loans back and, by the way, we're going to buy them out in a short period of time. Isn't that a deception If you're calling a development loan a lot loan?

A. It could be construed as such. The broader issue was that variants of that were going on in a number of other projects.

Q. Well it could be that there are various deceptions going on in many other banks, were there not?

A. Yes.

MR. FIALKO: I didn't hear the answer to that.

MR. SAVAGE: Yes.

THE WITNESS: Yes.

MR. FIALKO: Thank you.

BY MR. SAVAGE:

Q. But you're not here to say that just because there were lax requirements that people were deliberately lying or cheating or deceiving the banks and that they should not be held accountable.

A. No.

Q. Okay. That, again, is part of the crux, the blood life of your analysis, is it not?

A. That is correct.

Q. So in fact, if you look at what the examiners were doing back in those days, they, too, were concerned about things like straw loans in what's going on. And they ask, don't they? Are you familiar with a document that is provided at every bank examination called an "Officer Questionnaire?" A "Bank Officer Questionnaire."

A. Not directly. Because of the confidentiality of a lot of what goes on between the regulators and the bank per se, it is not public information and therefore constricted.

Q. Are you familiar with the form?

A. Generally speaking, I know the process but I'm not privy to the reports or examination or even not supposed to be even aware of the Camel ratings assigned or anything of that nature.

Q. Obviously --

A. Right.

Q. -- we're not talking about the bank's ratings, although this bank is defunct and it probably doesn't make any difference.

Let me show you what I'll mark as Sentencing Exhibit No. 6 which was admitted in the Vinson trial as Exhibit 1252. Can you see that document?

A. Yes.

Cross - Ruffin

Q. Okay. And what does that say on the top?
A. "Officer's Questionnaire Instructions, FDIC."
Q. Okay. And it is signed, is it not, in the middle and dated --
A. Yes.
Q. -- under penalty of perjury --
A. Yes.
Q. -- by the CEO of Pisgah Community Bank?
A. Yes.
Q. If we could go to the next page, and if you could look at question number three. It's telling the bank to list all extensions of credit made for the accommodation or benefit of anyone other than those whose names appear either on the note or other related credit instruments. It's asking for straw borrowers, isn't it, that the bank knows?
A. Not to be argumentative. The issue there, it seemed to me, is that these so-called straw borrowers were also people that were being recruited to effectively support or enhance the project.
Q. Right.
A. And so as I read that it would say accommodation or direct benefit of anyone other than those names that appear. So if the names of the developers appear on the credit facilities then that's the gray zone or the --

Q. Right. Well what if the developer in this case was Seven Falls, LLC, Keith Vinson, and his name doesn't appear on any of these loans?

MR. SCHEER: Objection, Your Honor. Seven Falls did appear. The banks were taking money from their own closing from Seven Falls, the sellers, and putting it into their banks to cover these loans. These hypotheticals ignore the fact that the banks knew that the money to carry the loan was in their own deposits as proceeds of the sale from Seven Falls.

MR. SAVAGE: Exactly. And they needed to disclose that to the regulators. That's the point of the question.

THE COURT: Well, as that question was worded, I sustain the objection.

BY MR. SAVAGE:

Q. Accommodation for the direct benefit of another, other than whose name appears. So if the developer comes in and has a group of investors, if you will, taking what were in effect were lot loans -- what are really a bridge loan -- that would have gone to the bank. Is that an accommodation for the benefit of someone other than who is named on those loans?

A. Well the primary purpose would probably be probably by a liquidity reach.

Q. Right.
A. And therefore, it could be construed as an accommodation to the principal borrower in this but, you know, it's circumstantial deal by deal as to what went on --
Q. Exactly.
A. -- and what really was the motivation.
Q. Okay. And a bank of this size, of $8 million in capitalization, and has a relatively low loan limit of $1.1 million, would you expect in the community banks that you have evaluated that the person who was the CEO would know about those loans?
A. Yes.
Q. And Mr. Durham, in this case, answers: "After discussion with CCO and my personal knowledge, I know no of no loans in our portfolio that meet this section." So if you were a bank examiner or you're looking at this credit as an outside third party, as you would be, and you're trying to figure out where are all these eggs? Are these related parties or are they not related parties? If you don't know whether or not there's another purpose for the loan or direct beneficiary you can't decide whether the bank is at risk or whether it's violated the loans to one borrower limit or its own credit policies.

A. Correct.
Q. And speaking of credit policies. The bank -- the FDIC introduced a 300% concentration limit back in 2006 as part of their guidelines, did they not?
A. Correct.
Q. And a hundred per- -- cannot exceed 100% if it's undeveloped property. Correct?
A. Yes. Correct. Construction and development lending in its abrogated system.
Q. So land that doesn't have a structure on it?
A. Yes.
Q. If bankers know they've exceeded that then they're going to be in trouble with the examiners unless they have a good reason not to do so. Right?
A. That's my understanding, yes.
Q. They have to explain it.
A. Yes.
Q. Okay. And it has to be a legitimate purpose before they can do it. So it's not like they just can do whatever they want to do.
A. Correct.
Q. Because if examiners come in and they find that they have inappropriately exceeded their concentrations, that's going to affect the level of risk that is assigned to their loan portfolio. Right?

Cross - Ruffin

A.     Correct.
Q.     And if they have an inappropriate risk and their risk to loans are assigned to a watch list or to doubt, then they're going to have to increase -- as we see in your model, they're going to have to -- in Exhibit No. 2 -- they're going to have to increase their ALLL, their lost revenue. Right?
A.     Yes.
Q.     By the way, if they exceed the loan limit and they do so without the NCCOB, they need from the NCCOB to make any more loans. Correct? If they exceed their loan limit --
A.     That is my understanding, yes.
Q.     Yes. So if this bank were to disclose the fact, for instance, that it was making a trade of, say, a $1.1 million loan to one investor -- let's call that Jarco -- for a completely unrelated matter on a spec house, and then it has all these little lot loans for a golf course over here. And it says to these parties, if you buy this house over here and we swap them out and make everything look like it's new and legit, that's fine.
MR. FIALKO: Objection. Your Honor, this is exactly what my client pled guilty to. It's in his factual basis. I don't understand why it's relevant to talk about it with this witness. I mean that's -- the

hypothetical he just gave is actually what my client pled to, so I object to relevance.

THE COURT: Overruled.

BY MR. SAVAGE:

Q. Well? Can you freshen up the loans by simply swapping out one bad credit for another and putting another name on it?

A. Certainly not the way you're describing.

Q. Right. And you mentioned CBC. Now CBC had a model where it would put up a stake of 51% and it would perform a lot of back room features for a fee that normally you would expect the bank to have to finance on its own. Correct?

A. That was the model.

Q. And didn't that model include -- let's go to the other side of it. Didn't that model include an audit and loan review function?

A. It did.

Q. Okay. And in fact, if you were a de novo bank and you were new to PCB or new to CBC, you had to send in your loans once a month and explain to them, like, what you were doing and show them the loan sheets. Right?

A. I wasn't aware of -- to that detail of what their procedures were.

Q. Well were you aware that in this particular case,

before the transaction I just described, that indeed CBC detected in this loan portfolio an excessive concentration of loans by Pisgah into Seven Falls in August of 2009?

A. Yes. Through a loan review that was conducted I did see that evidence of that. Yes.

Q. Right. And you're aware that, despite having that knowledge, Mr. Durham and his CEO and the other defendants here went ahead with that, even though CBC was asking them did -- aren't you exceeding the loans to one borrower limit.

MR. FIALKO: It's the same objection, Your Honor. This is cumulative. I mean we've pled guilty to that exact offense.

THE COURT: It's overruled, Mr. Savage, but it seems to me that an awful lot of what you're doing is really reading to me what's already in the PSR.

MR. SAVAGE: Yes, Your Honor. Yes, Your Honor. And the point I guess I'm trying to make, and maybe I'm not doing it very inartfully, is that this is mitigation and we're talking about a lot of banks in general. What I'm trying to probe from this witness is what he knows about this particular bank and the generalities that might apply to any bank if you get down to the exact circumstances, as we are, the answer can be different.

THE COURT: Well as I understand it, Mr. Savage -- I'm not telling anybody how to try their case. But if I understood correctly what the questions on behalf of the defendants were about, it pertained to how the offense conduct that is set out in the presentence reports goes beyond the factual basis that has been admitted and gets into other areas which these defendants contend was not criminal in nature and that it was within maybe a gray area.

MR. SAVAGE: Yes, Your Honor.

THE COURT: It seems to me that your cross-examination is concentrating the issue of what the factual basis was in fact something unlawful, wasn't it?

MR. SAVAGE: Yes, Your Honor.

THE COURT: How is that giving me anything that I don't already have in the PSRs?

MR. SAVAGE: Yes, Your Honor. I'll move on.

THE COURT: Okay.

MR. SAVAGE: If I can have one minute, Your Honor?

THE COURT: You may.

BY MR. SAVAGE:

Q. In response to counsel for Mr. Chapman's question, you answered questions concerning loan to cost versus loan to value. Is that right?

A. Correct.

Q. Now in real estate, an appraisal's done for each transaction -- it's required by the FDIC to have an independent appraisal.

A. Correct.

Q. Okay. And every appraisal for real estate requires that -- or generally would require that the appraiser calculate both the cost and the market value.

A. Correct.

Q. So the bank in this case, Pisgah, would have had cost value in every single circumstance.

A. Correct.

Q. And market value is a little more tenuous and it depends upon what -- like what are the circumstances of that time?

A. Correct.

Q. It also depends on how independent the appraiser is, doesn't it?

A. Yes.

Q. So if the developer's picking the appraiser, that's a little bit of a concern.

A. The degree of which regulators now enforce a much more stringent analysis of the appraisal work is very positive. It was very loose and very subject to that type of abuse, and we certainly saw through a lot of the

Cross - Ruffin

work we did in the financial -- the heat of the financial crisis appraisals done on the same property that had widely varying degrees of value applied to it.

Q. Right.

A. So now there is a much greater scrutiny applied to that process, and I think that abuse aspect has been -- to the credit of the regulators a lot of that's been eliminated.

Q. But it was an abuse?

A. Oh. Yes, it was clearly. But it also meant that in many ways banks were taking that leap of faith that whatever was as completed -- and that's the term, the operative term, "as completed value." Well there's a lot that has to happen between today and as completed, and the lack of oversight of that, the lack of servicing of that, the bet on the market moving in the right direction and all the stars aligning in a positive way is not the kind of decision that the banking system needs to be making. And that's what I got -- my point about the loan to cost versus loan to value.

Q. Thank you.

One second, Your Honor. No further questions, Your Honor. We'll pass the witness.

THE COURT: Mr. Fialko, do you have anything else for this witness?

MR. FIALKO: I have three or four questions, Your Honor.

**REDIRECT EXAMINATION**

BY MR. FIALKO:

Q. You were asked -- you were shown an exhibit that was a credit policy of Pisgah Community Bank. Is that correct?

A. Correct.

Q. Do you suspect that that credit policy came from the services that Capital Bancorp gave to their de novo banks?

A. I suspect it does. It carried some of the same logo similarities and kind of branding that we were familiar with Capital Bancorp.

Q. Okay. Your Honor, may I hand him a paper copy as well as this so he can leaf through it?

THE COURT: If it will save us any time, please do.

MR. FIALKO: I will because I'm going to be as fast as I can. Thank you.

BY MR. FIALKO:

Q. I'm going to show you what I'm marking as Defendant's Exhibit 2. Your Honor -- I mean Mr. Ruffin, this is an agreement between the Federal Reserve and Capital Bancorp. If you look at page 11 it appears to be

dated September 21st 2009. Do you see that?
A. Yes.
Q. All right. Are you familiar with consent orders and agreements that banks have after receiving inspections by the FDIC or Federal Reserve?
A. Yes.
Q. All right. If you -- there's just a couple of places I'd like you to look at. If you can look at page five in paragraph five.
A. Yes.
Q. Under this agreement, at the last line of it, it appears that there was a Federal Reserve inspection on March 12th, 2009. Is that what it says?
A. Yes.
THE COURT: Mr. Fialko, page five, paragraph five is not on the screen.
MR. FIALKO: I apologize, Your Honor.
THE COURT: Thank you.
BY MR. FIALKO:
Q. And is one of the things that CBC is agreeing to in -- well, can you read paragraph 5(a) to yourself for a moment please?
A. Yes.
Q. Is one of the things that Capital Bancorp is agreeing to is that they have to revise its ALLL

methodology for all loans held by Capital Bancorp?
A. Yes.
Q. Does that mean to you that Capital Bancorp's ALLL policy seems to be lacking to the Federal Reserve?
A. Yes.
Q. Can you please turn to page seven and look at paragraph nine? Can you go ahead and read paragraph nine through 9(a) and (b), please, to yourself? Excuse me. 9(a), (b), (c) and (d).
A. Yes.
Q. Does it appear that the Federal Reserve is requiring Capital Bancorp to create and submit an acceptable written plan to the consolidated organization's risk management practices? Is that what it says?
A. It does.
Q. What does that mean to you? What do you think the Federal Reserve, in your experience, found if they're requiring CBC to do that?
MR. SAVAGE: Objection, Your Honor, as to what this witness thinks.
THE COURT: Sustained.
MR. FIALKO: If you can look at paragraph 9(d). Can you read that out loud?
THE COURT: 9(d) is not on the screen,

Mr. Fialko.

THE WITNESS: 9(d)?

BY MR. FIALKO:

Q. 9(d).

A. "Measures to address the deficiencies in risk management detailed in the report of inspection."

Q. Those are the questions I have, Your Honor.

THE COURT: Mr. Scheer, do you have anything else for this witness?

MR. SCHEER: I do not have any further questions. Thank you.

THE COURT: Mr. Devereux.

MR. DEVEREUX: Your Honor, I do.

**RECROSS EXAMINATION**

BY MR. DEVEREUX:

Q. Mr. Ruffin, you have written about one of the problems in the 2000-2008 era being as what you described as lenders leading with appraisals. What do you mean by that?

A. Inappropriately advocating traditional lending underwriting to a third party, an appraiser. How I was trained as a commercial lender and analyst was that you always got an appraisal that was an aside, but you never made your credit decision fundamentally based on an appraisal. It was subject to appraisals, yes, but never

as the core underwriting methodology that you made your lending decision by.

Q. So lenders were giving -- in that era were giving too much weight to appraisals.

A. I think so, yes.

Q. Let me ask you another way. I'm sorry. Go ahead.

A. I think it was just a shortcut to do what was -- should have been classical credit underwriting by the bank.

Q. They were --

A. They were using the appraisal as a crutch to effectively overcome their own underwriting responsibilities.

Q. Thank you. Those are my questions.

THE COURT: Mr. Savage, anything else?

MR. SAVAGE: Nothing further, Your Honor.

THE COURT: Okay. Mr. Fialko, are we finished with this witness?

MR. FIALKO: Yes, Your Honor. Thank you.

THE COURT: Thank you, Mr. Ruffin. You may step down.

(Witness excused at 11:20 a.m.)

MR. FIALKO: Your Honor, I did not have any other evidence to present at this time.

THE COURT: Mr. Scheer, will you be presenting

any other evidence?

MR. SCHEER: No, Your Honor.

THE COURT: Mr. Devereux?

MR. DEVEREUX: No, Your Honor.

MR. SAVAGE: Can I have a moment to confer with my co-counsel?

THE COURT: You may.

MR. SAVAGE: Your Honor, in light of the cross, there's no further witnesses from the government.

THE COURT: Okay. Is there any other evidence or any other matter that needs to be addressed as part of this hearing? Anything else for the government?

MR. SAVAGE: No, Your Honor. May I ask for a clarification? In anticipation of the sentencings occurring on June 2nd we would like to put together a sentencing memorandum that may include additional documents but not witnesses for the Court to review.

THE COURT: Okay. We'll come back to the housekeeping things in a minute. Right now I want to make sure we've finished up everything in terms of presentations for today.

MR. SAVAGE: Can we move for the admission of our Government's Exhibits 1 through 6?

THE COURT: And that will be allowed.

(WHEREUPON, the aforementioned

exhibits were admitted into evidence without objection.)

THE COURT: Are you moving for the admission of your exhibits as well?

MR. FIALKO: Exhibits 1 and 2, yes, please.

THE COURT: And that will be allowed as well .

(WHEREUPON, the aforementioned exhibits were admitted into evidence without objection.)

THE COURT: Mr. Fialko, do you have anything else that you want to present?

MR. FIALKO: No, sir.

THE COURT: Today or any --

MR. FIALKO: No, sir.

THE COURT: Okay. Mr. Scheer?

MR. SCHEER: Not at this time, Your Honor.

THE COURT: Mr. Devereux.

MR. DEVEREUX: No, Your Honor.

THE COURT: With regard to the hearing which I hope to have on June the 2nd. As Mr. Savage mentioned, there would -- it was anticipated that there would be sentencing memoranda that would be submitted. As I think everybody knows, I would like those as far ahead of time as possible. Because there is one thing that drives me insane and that is getting a sentencing memorandum on the

morning of sentencing. I will limit any sentencing memoranda to 25 pages in length, 14-point type please, double-spaced. That does not count any exhibits that you're going to attach.

Today is April the 23rd. Mr. Savage, what would be a reasonable deadline for your sentencing memoranda?

MR. SAVAGE: If I can just have a moment, Your Honor?

THE COURT: You may.

MR. SAVAGE: Your Honor, can I ask the Court -- would the Court permit rebuttal -- would it be May 22nd for everyone, or is it going to be opening.

THE COURT: Everybody gets 25 pages.

MR. SAVAGE: Right. But is everyone's going to be due the same day? I'm just asking if there would be an opportunity if in another brief that we haven't seen, are we going to be able to reply to that?

THE COURT: Well you're going to have a sentencing hearing.

MR. SAVAGE: Yes, Your Honor. The May 22nd --

THE COURT: I'm contemplating you get a 25-page brief a week later, they get a 25-page brief. And if you really think you need to rebut it, you can say something at the hearing.

MR. SAVAGE: Okay. Respectfully, we were just

wondering why wouldn't they just all be due on the same day if there's no rebuttal. I mean everybody would be on the same footing, more or less.

THE COURT: Well I'll entertain that. What do you say is a --

MR. SAVAGE: The week of May 18th. Would that give the Court enough time to review it?

THE COURT: Well let me see what the defendants can do.

Mr. Fialko, what's a reasonable deadline for your brief or sentencing memoranda.

MR. FIALKO: May 18th would be acceptable to me, Your Honor. I think Mr. Scheer and Mr. Devereux may have more time crunches than me. I'm fairly flexible at the time with my time.

THE COURT: Mr. Scheer.

MR. SCHEER: Your Honor, I just completed a month-long trial in Charlotte that was two weeks longer than everybody anticipated and I am backed up. I have another trial next week that I hope is only going to be three or four days, an argument to the Fourth Circuit on a very substantial constitutional argument with Amy Ray on May 12th or 13th, I believe, and it is in Richmond. That is all to say that I would very much appreciate a deadline of one week before as opposed to two weeks

before the hearing, Your Honor.

THE COURT: Mr. Devereux.

MR. DEVEREUX: Your Honor, we have a state court trial that's starting the week of this sentencing hearing after this sentencing hearing. So I would -- a week out, or May 22nd, would be preferable. But we're certainly --

THE COURT: So for you the earlier the better; right?

MR. DEVEREUX: Well, not exactly.

THE COURT: I mean I want to be fair to everybody. Mr. Savage, as to your point, for sentencing on all of these issues, really, you have the burden of proof. So it seems to me that it is fair for the defense to have the opportunity to rebut what you say. And if you really feel the need to reply -- if they throw you some curve that you've never seen before, which I really doubt is going to happen, then you can address it at the hearing. So I really don't understand your argument about how it's unfair that they get to respond to what you write with regard to --

MR. SAVAGE: We only have the burden, Your Honor, with respect to contested facts and there are no contested facts. I mean it's the 3553 factors, and often I think we're in the same position. The government is in no better or worse position regarding 3553(a) factors

than anyone else and there are no disputed contentions here. I mean there are no factual objections. I checked the other ones, and the same would be true about Mr. Ollis and Mr. Gabler.

So, yes. If the government had to prove a fact, which we are prepared to do here today, we're fine, but we're in no worse or better shape than anyone else. And respectfully -- I'm not going to quibble. We'll do what we need to do. I think everybody should be on the same plain -- I mean the people deserve justice just as much as these defendants do, and no one is superior to the other. We're all in the same boat at this point.

THE COURT: The government's sentencing memorandum will be due on Thursday, the 14th of May. The defendants' will be due on Thursday, the 21st of May.

Please, again, remember the font requirement. That is particularly directed at one member of the bar.

MR. DEVEREUX: Your Honor, we brought our font consultant with us this morning.

THE COURT: With regard to the hearing. Particularly after hearing the proceedings today, it is my inclination to hear the sentencing hearing with regard to the remaining defendants -- not including Mr. Vinson -- and to hear it maybe as one hearing? In other words, to the extent that there are arguments to be made, to

have all the arguments made with regard to the various defendants and then pronounce sentence with regard to the five. I don't think I have ever done that with five defendants at once. I've done it with two and I've done it with three.

Mr. Savage, what's the position of the government with regard to that?

MR. SAVAGE: Your Honor, we're all for doing it efficiently but I am just really concerned about how persnickety the Fourth Circuit has become on just not -- to us it's all obvious what the Court intended. But the way the record comes out and the exact findings that are made with respect to each individual defendant will be scrutinized at the appellate levels, even if there's an appeal waiver, for various reasons.

I'm always concerned that if you have more than one defendant that it's hard for anybody, let alone one court, to keep track of all five when you make all the necessary findings and consider and weigh all the different factors for five different people and apply them. It could be a difficult task for you.

THE COURT: Well and I appreciate that. And I actually considered that because, more particularly, what I have in mind is going forward, for instance, completing the Rule 11 as to each one, and of course those findings

would then be individual as to each defendant. To the extent that there are any presentence objections that pertain to any one of these defendants -- and having gone through the record in preparation for today I don't know that there are many substantive objections even left, but each of those would be done independently. So the findings on any contested fact as to defendant number four would be made as to defendant number four. If that is a fact that is common to defendants four and five, then we could have those two both presenting whatever they needed to.

MR. SAVAGE: Yes, Your Honor.

THE COURT: I mean it seems that this sort of lends itself to sorting that out, but at the same time I share your concern. I'm just asking, is this a hearing that we can make sure that we avoid the pitfalls of doing it that way? And that way I really do not end up with a problem of having unwarranted sentencing disparities because I'm sentencing all five at the same time at the end of the process, and therefore they're all being weighed one against the other.

MR. SAVAGE: Yes, Your Honor. We'll obviously defer to the Court on that. I recently have gotten an appeal in a case that, for instance, Judge Whitney tried. There was six or seven defendants. And even though they

were tried individually, the defense has made numerous objections -- I don't know whether they'll stick or not -- with regards to procedural adequacies under 3553(a) and whether the Court adequately considered each and every factor or considered one more than the other, and it became a very particularized thing as to that defendant. So I could see a scenario where it could be, depending on the objections that are raised, if they get mixed up somehow that there could be procedural error. That would be my only point.

THE COURT: Okay. Mr. Fialko, what's your view?

MR. FIALKO: I happen to think your idea is an excellent one. I am confident this Court can parse out everything per defendant. I would also note that at least my client and, I think, the other clients have waived their appeal rights. I don't really know there's going to be an issue with any appeal anyway. So I would like for you to do it the way you propose.

THE COURT: Okay. Mr. Scheer.

MR. SCHEER: Yes, Your Honor. I agree with the proposed approach.

THE COURT: Mr. Devereux.

MR. DEVEREUX: We agree also, Your Honor.

THE COURT: Obviously there are two other defendants who are involved in that process and I would

need to get some input from them as well. But tentatively, that is what I would propose to do and just set all of them for the 2nd.

Mr. Savage, I think your point may be well taken that it would be unrealistic to handle those five and then think that I could get to Mr. Vinson after that at the end of the day. I want to save you as many trips from Charlotte to Asheville as I can but I'm afraid that I can't save you that trip.

MR. SAVAGE: Please don't, Your Honor. I really enjoy my trips to Asheville.

THE COURT: Is there anything else that we can address today that is going to save us some time when we get to the sentencing in this case? Anything else for the government?

MR. SAVAGE: Nothing I can think of, Your Honor.

THE COURT: Okay. Anything else for any of the defense counsel?

MR. FIALKO: No, Your Honor.

MR. DEVEREUX: No, Your Honor.

THE COURT: Very good. I'll see if we can get this scheduled for the 2nd. I believe we can. I hope we can. Then hopefully we can get these cases finally resolved and taken care of.

Marshal, I think our next matter is set for two

o'clock. If you could recess us until 2:00 p.m.

(Off the record at 11:34 a.m.)

**CERTIFICATE**

I, Tracy Rae Dunlap, RMR, CRR, an Official Court Reporter for the United States District Court for the Western District of North Carolina, do hereby certify that I transcribed, by machine shorthand, the proceedings had in the case of UNITED STATES OF AMERICA versus AVERY TED CASHION, III, RAYMOND M. CHAPMAN, and THOMAS E. DURHAM, Jr., Criminal Action Number 1:12-CR-20 on April 23, 2015.

In witness whereof, I have hereto subscribed my name, this 28th day of April, 2015.

__/S/__Tracy Rae Dunlap__
TRACY RAE DUNLAP, RMR, CRR
OFFICIAL COURT REPORTER